Judgment rendered February 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,653-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

TAMEKA Y. SIMPSON-                           Plaintiff-Appellant
MITCHELL

versus

DANNY R. MITCHELL, JR.                       Defendant-Appellee

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 619,868

Honorable Katherine Clark Dorroh, Judge

* * * * *

THE LAW OFFICES OF WILLIAMS
 & WILLIAMS, PLC                             Counsel for Appellant
By: Sandra M. Williams
    David S. Williams

RONALD J. MICIOTTO                           Counsel for Appellee

* * * * *

Before PITMAN, COX, and MARCOTTE, JJ.

**MARCOTTE, J.**

This appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Katherine Dorroh presiding. Appellant Tameka Y. Simpson-Mitchell appeals the trial court's ruling denying her request to relocate the parties' child and awarding joint custody of the child with the father-appellee named as domiciliary parent. For the following reasons, we affirm the trial court's ruling.

## FACTS AND PROCEDURAL HISTORY

Tameka Simpson-Mitchell ("Tameka") and Danny R. Mitchell ("Danny") were married on September 30, 2012, in Shreveport, Louisiana. One child was born of the marriage, Makenzie Mitchell ("Makenzie"), on February 3, 2017. On October 10, 2019, Tameka filed for divorce; she asked for joint custody and that she be named domiciliary parent. Danny answered the petition and claimed that Tameka traveled extensively for her job as a bank auditor and would leave Makenzie with a "non-certified child care person." He also stated that Tameka denied him visitation with Makenzie and would not tell him where she was. He claimed that Tameka took Makenzie to Kansas with her without his consent. Danny alleged that there was tension between his mother and Tameka, and Tameka "attempted to interfere with church members" at the church where he worked, trying to "turn them against" him. He asked for joint custody and that he be named domiciliary parent. Danny also filed an exception of prematurity claiming that he and Tameka had not lived separate and apart for the requisite period of time to obtain a divorce.

On December 23, 2019, the trial court issued an interim order. The trial court appointed Leigh Ann O'Brien ("Ms. O'Brien"), a mental health evaluator, to perform an evaluation of the parties and Makenzie. The court ordered Tameka to pay for the evaluations. The trial court provided that the parties would have shared custody of Makenzie on a week on/week off basis.

On October 12, 2021, Tameka filed a rule requesting joint custody, that she be named domiciliary parent, and that she be allowed to reside with Makenzie in Kansas City, Missouri. On March 29, 2022, Danny filed an exception of no cause of action stating that he had repeatedly opposed relocation of Makenzie. He stated that he did not receive timely written notice from Tameka of a proposed relocation of herself and Makenzie and that Tameka did not seek the court's permission to relocate the child before doing so. The trial court denied the exception and ordered Tameka to return Makenzie to Shreveport by June 1, 2022. The court ordered that Danny would have custody of Makenzie until the parties returned to court on June 23, 2022, with Tameka allowed FaceTime/telephone contact with Makenzie three times per week.

On June 22, 2022, Danny filed a motion for a continuance, a motion to appoint an alternate mental health professional, and a motion for Makenzie to remain in Louisiana pending a hearing. Danny stated that he received notification from Ms. O'Brien that she would be unable to testify on June 23, 2022, due to allegations made by Tameka to the state board. Danny alleged that Tameka did so in an attempt to prevent Ms. O'Brien

2

from testifying, because she did not agree with Ms. O'Brien's recommendation.

On June 23, 2022, the trial court orally granted the parties a divorce and appointed Shelley Booker ("Ms. Booker") as the court's mental health professional to evaluate the parties and Makenzie and make a recommendation about custody and visitation. The court ordered that Tameka was to have custody of Makenzie until July 22, 2022, with Danny getting custody thereafter until the court gave further orders. The court ordered Danny to enroll Makenzie in a Shreveport elementary school. The case was reset for trial. On July 28, 2022, the trial court signed a written judgment.

On October 28, 2022, a trial was held. Prior to taking testimony, the parties stipulated that they wanted Ms. O'Brien's two evaluation reports admitted as joint exhibits, which the trial court allowed. In Ms. O'Brien's first report, dated September 1, 2021, she recommended that Makenzie be allowed to relocate with her mother. She found that Makenzie would thrive emotionally and developmentally with her mother in Kansas City, because Tameka would encourage her to have a relationship with her father. Ms. O'Brien stated that she did not believe Danny would do the same for Tameka. She said his anger about Tameka relocating would be a barrier to healthy communication. She said that both parents loved Makenzie very much and she had adapted to her parents living apart. She said Tameka was committed to adhering to the week on/week off custody schedule and had driven Makenzie every week from Kansas City to Shreveport, without Danny meeting her halfway.

In her second report, dated March 9, 2022, Ms. O'Brien changed her recommendation, stating that Makenzie should not be allowed to relocate, but should remain in Shreveport with her father. She said that Danny had provided additional information to her including: his phone records, 2018 bankruptcy filings on behalf of Tameka, UCC filings on behalf of Tameka, Tameka's criminal records related to traffic violations, and a shoebox full of financial information that included payday loans that Tameka received. Ms. O'Brien said that Tameka had been dishonest with her throughout the entire evaluation and had also been dishonest about moving to Kansas City.

Ms. O'Brien said that Danny informed her that Tameka gave him "mixed messages" about their relationship from 2017 to 2019, which began when she lied that she first moved out of their home in 2017. He said he attempted to contact Tameka when she moved out, because he was concerned about the whereabouts of his daughter; he eventually contacted child protective services for advice about what to do. Danny discussed his relationship with Makenzie and how he saw her every day of 2018. He said that Tameka did not inform him she wanted a divorce until January 2019, and from then until June 2019 she refused to discuss a joint custody plan. He was staying at Tameka's apartment at that time; Tameka asked him to leave in May 2019. He left and did not return.

In her second evaluation, Ms. O'Brien said that Danny informed her that Tameka was on temporary assignment from June 2019 to December 2019, and she was traveling back and forth each week with Makenzie. She did not communicate with him about how long her assignment would last and lied, stating the assignment had been cancelled. In June 2020, in a

4

session with Ms. O'Brien, Tameka admitted that the assignment would likely be permanent, and Ms. O'Brien said that the custody case became a relocation case, which was not what Tameka had presented prior to then. Tameka moved to Kansas City permanently in August 2020. Danny told Ms. O'Brien that he had no idea Tameka was in Kansas City from July 2020 to February 2021; he believed Tameka and Makenzie were in Shreveport due to phone calls, text messages, and pictures of them doing things locally.

Danny showed Ms. O'Brien documentation of the "significant amount" of payday loans Tameka acquired from 2014 to 2019. The loans were sent to a P.O. Box, of which he was unaware. He was also unaware of her bankruptcy proceedings. Danny told Ms. O'Brien that Tameka had a "sneaky and manipulative side."

Ms. O'Brien said that the information Danny provided "told a very different case than what Tameka presented during the evaluation." She said Tameka had numerous opportunities to inform Danny of her permanent position, but chose not to and chose not to abide by the notice requirements in La. R.S. 9:355.5. Ms. O'Brien said that Tameka told her that she left Danny in 2017, and wanted a divorce, which she communicated to him. Ms. O'Brien said that Tameka continued to see Danny until May 2019, and led him to believe that she was moving back in with him. Ms. O'Brien said she was also dishonest about her relocation and only sent a registered letter when, on February 2, 2021, Danny confronted her by phone about relocating.

Ms. O'Brien's final recommendation, found in her second evaluation, was that Makenzie reside with Danny in Shreveport and attend school there.

She recommended joint custody with Danny designated as the domiciliary parent. She also recommended a detailed visitation schedule.

At trial, Tameka gave the following testimony. She moved into Danny's house when they married. She claimed Danny kicked her out of the house in 2014, at which point she got an apartment with her friend and coworker, Karen Showers ("Showers"). Danny asked her to move back in and they attended marriage counseling; she did so, believing the marriage could be saved. She got pregnant in June 2016. Her pregnancy was high risk, so she was in the hospital for three months on strict bed rest.

During that period, the couple's residence was being renovated, but it was not finished by the time Makenzie was born in February 2017. Tameka and Makenzie moved into the home of Danny's mother, Tommie Fay Mitchell ("Tommie"). Danny would not stay there with his wife and daughter, but would eat and shower there and then leave. Tameka purchased a plane ticket for Tommie to go to California to care for her sister; during the three-month period of Tommie's absence from her home, Danny lived in his mother's house with his wife and child. He moved out when his mother returned. Tameka and Makenzie lived at Tommie's house from February 2017 until December 16, 2017, when Tameka and Makenzie moved into an apartment with her friend Showers.

Tameka stated that she worked for the Federal Deposit Insurance Company ("FDIC") for approximately 14 years as a bank auditor, which required that she travel regionally for her work. Tameka said that she would mostly commute to and from her assignments daily in order to care for Makenzie. The only exception was when she had two training sessions in

Baton Rouge; it was then that Danny stayed at her apartment to care for their child. Tameka received *per diem* travel reimbursement from her employer.

Tameka was offered a temporary position with the FDIC in Kansas City, Missouri, for six months from August 2019 to February 2020, and it was during that period that the trial court ordered week on/week off visitation. The assignment was later extended to July 2020. Tameka had admitted into evidence a temporary work assignment notification from the FDIC. She informed Danny in a joint session with Ms. O'Brien that the position could become permanent. Tameka filed her official notice to relocate with the FDIC in January 2021 and sent a notice to Danny by certified mail that she would be relocating Makenzie on February 3, 2021. On February 9, 2021, Danny responded, saying he objected to the relocation.

Tameka said that Ms. O'Brien did not contact her about the allegations that Danny made, which were the subject of her second evaluation. Ms. O'Brien also did not contact Stephanie Womack ("Ms. Womack"), a licensed professional counselor in Missouri and Kansas who conducted 11 sessions with Makenzie. Tameka said that she paid Ms. O'Brien's initial fee of $2,500 for Ms. O'Brien's first evaluation. She stated that Danny told her he paid Ms. O'Brien another fee for the second evaluation.

Tameka said that she was Makenzie's primary caretaker and paid for everything, including her health insurance, extracurricular activities (summer camp and swim lessons), child care, and birthday parties. Danny paid part of the birthday party expenses, but he was not present at Makenzie's third birthday party. When Makenzie was born, she slept in a

7

bassinet in the same room as her mother. When Tameka was on temporary assignment in Kansas City, she and Makenzie slept on a king-size bed in a hotel suite.

Tameka stated that she never missed a visitation. She said that Danny never offered to meet her halfway between Kansas City and Shreveport until a court ordered him to do so. She said that Danny came to Makenzie's first doctor's appointment, but did not attend any after that. Tameka said that Danny paid for seven weeks of childcare in 2018, but she paid all the rest. Makenzie's childcare consisted of a private sitter until they went to Kansas City, and then she was enrolled in pre-K at two years old.

When the couple first discussed divorce in 2018, Tameka moved into an apartment and gave Danny a key so that he could periodically stay the night. Tameka claimed that Danny did not have a place for Makenzie to stay prior to the week on/week off order; he did not complete the renovations to his home or have furniture in the home until 2019. In 2018, Tameka had mandatory training in Baton Rouge, so Danny stayed in her apartment with Makenzie while she was out of town. She stated that during her out-of-town training sessions, Danny would not let her speak to Makenzie on the phone, so she got her key back from him when she returned.

Tameka stated that she has no criminal record. She acknowledged that Danny gave Ms. O'Brien her documents related to parking tickets and UCC filings regarding a lien against movable property she owned. Tameka believed that Danny interfered with her communication with Makenzie by giving her an incorrect phone number and hanging up on her when she was speaking with Makenzie. When Makenzie asked her if she was going to call

8

the next day, Tameka testified that she told her daughter that Danny only let her speak to Makenzie on Mondays, Wednesdays, and Fridays. The trial court admonished Tameka for telling Makenzie that and said that it was the court that ordered the phone call schedule. Tameka stated that Danny had not facilitated additional visitation with Makenzie beyond what the court ordered.

Tameka said that she bought a cell phone for Makenzie so that Danny could call her whenever he wanted. Tameka said that Danny told her he was considering moving to Kansas City and she offered to buy him a plane ticket. She alleged that Danny told Makenzie that she was getting a new mom. She said that she has never told their child that she is getting a new dad.

The following testimony was elicited from Tameka on cross-examination. Tameka said that she has another daughter, named Mia, who is 25 years old. Mia grew up in Mississippi. When Mia was 10 years old, Tameka had a job opportunity with the FDIC, which required extensive travel, so she left Mia with her grandmother in Mississippi. Tameka would visit Mia when she could. With Makenzie, she commuted so that she could be with her every evening. Tameka stated that she works remotely, but the FDIC requires that she reside in her duty station, which is Kansas City.

Defense counsel then had admitted into evidence several text message conversations between Tameka and Danny. There were several times in which Danny asked Tameka where Makenzie was, but she either did not respond or she said that she was in training, Makenzie was in child care, and to leave her alone. There were text messages where Danny said he was

9

coming to pick Makenzie up, and Tameka said, "You are not picking her up." Tameka stated that she informed Danny verbally through phone calls that she had taken Makenzie to Kansas City, and that his repeated text messages asking where she was constituted "harassment."

On redirect, Tameka said that Danny would not text much after work hours, but was only interested in knowing about Makenzie during the day. In May 2019, Danny texted Tameka about coming over, she said that he could do so, but it had been a week since he had seen Makenzie. Tameka said that she has a three-bedroom house that she rents in Kansas City and that Mia lives with her there. She said she is willing to transport Makenzie every weekend so that she can see her father, and she is willing to let Danny have school breaks and alternate holidays.

Ms. Womack testified that Tameka sought counseling for Makenzie, because she was concerned about her behavior when she went to visit Danny; she would cry and not want to go, exhibiting separation anxiety. Ms. Womack stated that her anxiety got better, but she was still anxious about leaving one parent to visit another. Ms. Womack testified that Makenzie told her that she missed her mom and wanted to live with her mom; she would cry because she missed her mom. Makenzie stated that her father locked her in her room and told her to stay there until dinner. Makenzie told Ms. Womack that her father poked her with toothpicks and he plays rough. Ms. Womack reported that on February 17, 2022, Makenzie said that she wanted to stay with her mom forever. Ms. Womack's treatment summary was admitted into the record over defense's objection.

10

On cross-examination, Ms. Womack stated that she never contacted Danny. She said that Tameka gave her Kansas City address as her home address to Ms. Womack.

Showers testified that she lives in Kansas City and is Tameka's friend and coworker. When Tameka had her temporary assignment in Kansas City, Tameka stayed with her, and Makenzie would be there during her week on/week off visitation schedule, from around August 2020 to January 2021. Showers was aware Tameka had another child and that she "signed her over" to her mother to raise. Mia did not live with Tameka and Showers when they shared an apartment in Shreveport. Showers said that she was unaware if, during the time that Tameka stayed with her in Kansas City, she was also living in hotels. Showers said that she went back and forth to Dallas, Texas, during that period, so she was not fully aware of everything Tameka did. She had a two-bedroom house in Kansas City, and Tameka and Makenzie slept together in the same bed in the spare bedroom. Showers denied a sexual relationship with Tameka, stating that she (Showers) has a fiancé. Showers testified that she had not been to Tameka's house in Kansas City.

Danny provided the following testimony. At the time of trial, he had been a church pastor for 10 years. He said that his mother lives in Shreveport and his father is deceased; he also has an aunt living in the area. He works from 10:00 a.m. to 2:00 p.m. Monday through Friday, and his busiest days are Saturday and Sunday. Makenzie goes to church with him, and she is in kindergarten at a public magnet school in Shreveport. Danny drops Makenzie off at school and picks her up every day. A copy of

11

Makenzie's report card was admitted, showing that she performed satisfactorily in all her classes and had an "A" in conduct. Makenzie had perfect attendance except for one sick day for which she had a doctor's note. Danny stated that Tameka had not attended back-to-school night, but he admitted that he did not share Makenzie's teachers' contact information with her. Danny presented the trial court with information about the various local activities Makenzie could participate in.

He had admitted photos of his home depicting Makenzie's room; the photos showed that there was no lock on the door to Makenzie's room. Danny said that he did not pay any medical bills that were not covered by insurance. Tameka offered no child support, even though she makes double what he earns. During their week on/week off visitation, Danny personally took care of Makenzie; he did not rely on child care. He has a vehicle for transportation.

Danny testified that Tameka filed for bankruptcy in 2018, a fact she did not share with him. Danny said that he found out that Tameka was moving to Kansas City through friends and not from her. He said Tameka was involved in payday lending and had a warrant for her arrest for driving with a suspended license. Danny said he was charged in 2000 for driving under a suspended license, but he now has a valid driver's license.

Danny stated that when Tameka was living in Shreveport with Showers, he believed they were getting back together. He said that Tameka moved out of his mother's house without telling him, so he contacted child protective services, because Tameka would not answer her phone.

Danny said that he never hurt Makenzie and he never left her alone. He stated that he did not lock the door to her room. Danny tried to facilitate a relationship between Makenzie and Tameka and to communicate with Tameka. Danny said that if the trial court ordered that Makenzie remain in Shreveport, he suggested visitation that accommodated Tameka. Danny said that he wants to do what is right for their child, and he does not discuss what occurs in court with Makenzie. He said that he wants to let her be a child.

Danny testified that Makenzie is close with her maternal grandmother in Mississippi and will be closer to her if she resides in Shreveport, rather than in Kansas City. Danny agreed that Tameka traveled a lot less after Makenzie was born, and she only had to stay out of town twice. He stayed in her apartment during those periods to care for their child. Danny said that he can't move to Kansas City, because his church is here.

Danny said that Tameka told him about her temporary assignment in Kansas City, and that if he wanted to see Makenzie, he would need to fly. Danny then told Tameka that they needed to figure out custody and visitation in court, but then "she was gone." Tameka initially told him that her assignment in Kansas City was postponed, but then she never said that it was back on again and that she was taking their child there.

On cross-examination, Danny acknowledged that he did not pay for any extracurriculars for Makenzie before their week on/week off custody schedule. Danny testified that he did not give any money to Tameka for medical expenses and that Tameka paid for the house renovations for his home.

Tommie testified that she is Makenzie's paternal grandmother. She said that Tameka and Makenzie lived with her for a year after Makenzie was born. She said that she built a relationship with Makenzie while she lived with her. She said that Tameka and a group of women started some trouble at Danny's church and, on one occasion, Tameka "yanked" Makenzie out of Tommie's arms. She did the same another time at a restaurant. Tommie stated that she started seeing Makenzie again after the week on/week off custody began. She stated that she got to see Makenzie often and she has a good relationship with her. She said that Danny has a good relationship with his daughter and interacts with her well. Tommie said that she did not believe that she would see Makenzie if she lived in Kansas City.

On cross-examination, Tommie said that when Tameka and Makenzie lived with her, Danny would not stay there, because he would go back to his house to watch over it, due to people having stolen things from his home while it was being renovated. She said that there was an outburst at church one time, Tameka was not involved, but rather got up and left. Tommie stated that she was unaware that Tameka planned to move out of her house.

Tommie said that one day Tameka called the church and asked to speak with Danny. Tommie had Makenzie with her, which Tameka could hear in the background of the phone conversation. Tameka "ordered" Tommie to get Danny, because "I don't want you to have anything to do with my child." Tommie said that she has not seen Makenzie cry or be anxious around Danny or ask for her mother. Tommie observed that Danny cares for Makenzie's needs and they are affectionate with each other.

Tameka provided rebuttal testimony, saying that she spent thousands on materials for renovations to Danny's house. She said that when she lived with Tommie, she saw her improperly feeding Makenzie. Makenzie had problems with acid reflux and needed different formula. Tameka said that Tommie was aware of the problem and allowed Danny to feed Makenzie the wrong formula. She said she went to Tommie's house and observed that Danny was feeding Makenzie the wrong formula and that their child was crying and was wet. She testified that she also observed Makenzie crying whenever Tommie would hold her, so she did not feel comfortable having Makenzie around her grandmother. The trial court noted that throughout her testimony, Tameka referred to Makenzie as "my child" or "my baby" and not "our child."

On January 10, 2023, the trial court stated in its written reasons for judgment that it was not in Makenzie's best interest to relocate and was in her best interest that her parents be awarded joint custody with Danny designated as domiciliary parent. The trial court stated that it considered Ms. O'Brien's reports and again noted that Tameka testified about Makenzie in a very possessive manner. The trial court provided the following reasons for its determination, reviewing first the factors from La. C.C. art. 134:

1. The court did not receive any evidence at trial that indicated that Makenzie would be abused by either parent.

2. Both parents showed love and affection toward their child and were capable of doing so in the future.

3. Both parents had the capacity and disposition to give Makenzie love, affection, and spiritual guidance, and to continue her education.

4. Both parents provided food, clothing, and shelter to Makenzie, and both had done so since her birth.

15

5. The court found that Makenzie lived in a stable, adequate environment equally between both parents, because they shared equal custody of her.

6. The court determined that Danny was able to provide "permanence, as a family unit, of the existing or proposed family home," because he has always lived in Shreveport. The court noted that Makenzie always lived in Shreveport, and Tameka had lived in Kansas City for a short period.

7. There was no evidence presented at trial that either parent was morally unfit. The court found that Tameka was not entirely honest with Danny about her assignment in Kansas City, and she did not notify him of her intent to relocate Makenzie permanently until she was stationed there for three months. Danny attempted to figure out where Makenzie was during Tameka's custodial periods, and she was "extremely evasive" in responding to his requests for information.

8. There was no evidence presented that either parent had a history of substance abuse.

9. There was no evidence presented indicating that either parent had mental or physical health issues. The trial court stated that it considered Ms. O'Brien's reports, which initially recommended 50/50 custody, but that Tameka's intent to relocate Makenzie made that recommendation unworkable.

10. The trial court found that the factor regarding Makenzie's home, school, and community history was equal between the parents, because they had been sharing 50/50 custody.

11. The trial court stated that Makenzie was not asked to state a preference concerning which parent she lived with.

12. The trial court expressed concerns about the parents' willingness and ability to facilitate and encourage a close and continuing relationship between Makenzie and the other parent. The court said that the history between Danny and Tameka was "very contentious" and the two were "bitter toward one another and appear to harbor ill feelings toward the other." The trial court said it was "cautiously optimistic" that they could put the past behind them and work together to rear Makenzie.

13. The trial court indicated that the distance between Shreveport and Kansas City is significant and would make exchange of Makenzie complicated.

14. The trial court found that both parents exercised their responsibility in caring for and rearing Makenzie, because they shared the task between them for nearly three years. The trial court found that Tameka's testimony that she cared for Makenzie 100% of the time prior to the December 2019 order from the court to be overstated.

The trial court next considered the following "noteworthy" factors from the relocation statute, La. R.S. 9:355.14:

1. The court stated that Makenzie had a relationship with both parents, because they had shared equal custody since December 2019, so that factor was equal between the two parties.

2. The court stated that Tameka provided the court with information about what school Makenzie would attend in Kansas City, but nothing about any activities available for a child in the city. Danny provided both about Shreveport.

3. The trial court found that it was not feasible for Danny to travel frequently to Kansas City to see Makenzie on a regular basis. The court stated that Makenzie not having daily contact with her father would not be in her best interest.

4. The trial court stated that no evidence was presented suggesting that either parent would attempt to thwart the relationship between Makenzie and the other parent.

5. The court found that Tameka failed to present evidence, "other than her limited testimony" to show how Makenzie's quality of life would improve in Kansas City.

6. The court examined the reasons each party had in seeking or objecting to relocation. Tameka relocated because of her employment, which the court found to be legitimate and sincere. The court said that Danny opposed relocation because Makenzie would not have daily contact with him.

7. The court found that the factor regarding the current employment and economic circumstances of each parent was equal between the two. But the court was concerned about the how the proposed relocation would affect Makenzie. The court said that there was very little evidence presented about what Makenzie's life or routine would be like in Kansas City, and there was no evidence offered other than Tameka's testimony about the proposed school Makenzie would attend if she was allowed to relocate.

17

8. The court noted that no child support had been ordered, but that each parent supported Makenzie while she was in their custody.

9. The court stated that Danny cannot relocate, because he has employment and responsibilities in Shreveport.

On February 13, 2023, the trial court signed a written judgment denying relocation and awarding joint custody with Danny designated as the domiciliary parent. The court then provided a detailed custody schedule for holidays, school breaks, and when Tameka is in Shreveport and desires to visit Makenzie. The court ordered "free and open communication" with Makenzie when she is in the custody of the other parent and ordered that the parents exchange her in Fort Smith, Arkansas. Costs were assessed to both parties, including the costs of the mental health evaluation. Child support was to be determined at a later date and each parent will claim the child for tax purposes in alternate years. Tameka now appeals.

## DISCUSSION

*Ms. O'Brien's Second Evaluation*

In her first assignment of error, Tameka argues that the trial court should not have considered Ms. O'Brien's second evaluation report. She states that she paid 100% of the costs for the first evaluation, and she informed Ms. O'Brien that she would not be able to pay her fee for testifying at trial by the time of trial, to which Ms. O'Brien did not respond. A few months later, Danny paid Ms. O'Brien a substantial fee for the second evaluation, in which she said that Makenzie should not be allowed to relocate. Tameka then filed a complaint with Ms. O'Brien's board, the Louisiana Association of Social Workers.

18

Tameka claims that there were discrepancies between Ms. O'Brien's first and second evaluations. She claimed in her first evaluation that she spoke with Makenzie and found that she would adjust well to relocation, so the child discussed the move with Ms. O'Brien. In her second evaluation, Ms. O'Brien said that Makenzie was "very guarded" about moving to Kansas City and was not comfortable disclosing information. Tameka avers that there is no indication that Makenzie met with Ms. O'Brien for the second evaluation.

Danny argues that the trial court did not err in considering Ms. O'Brien's second evaluation, because both parties stipulated to it being entered into evidence, and the court should consider all the evidence presented at trial. Danny claims that Tameka failed to preserve her first assignment of error for appeal when she stipulated to the evidence being admitted.

In her reply brief, Tameka argues the trial court should not have considered Ms. O'Brien's second evaluation because it was not fairly or properly performed. Tameka states that Danny made several incorrect statements in his brief to this court. She states that Danny's assertion that she did not preserve for appeal her assignment of error about Ms. O'Brien's second evaluation was a misstatement of her argument. She did not state that the trial court erred in admitting the second evaluation, but rather erred in considering it.

Failure to make a contemporaneous objection to the admission of the evidence waives the right to contest it on appeal. La. C.E. art. 103; *Pratt v. Culpepper*, 49,627 (La. App. 2 Cir. 2/27/15), 162 So. 3d 616.

19

Whether Tameka frames her argument as an admissibility error or a consideration error, it seems illogical to this court. She offered Ms. O'Brien's two evaluation reports as a joint exhibit, essentially asking the trial court to consider them. She cannot now complain on appeal that the trial court did just that. If Tameka did not want the trial court to consider one or either of Ms. O'Brien's evaluation reports, she should not have offered them as a joint exhibit, but rather contemporaneously objected to their admission. We do not find that the trial court erred in considering either of Ms. O'Brien's evaluation reports.

*Relocation*

In her second assignment of error, Tameka contends that the trial court erred in denying relocation and finding that it was in Makenzie's best interest to reside in Shreveport with Danny as her domiciliary parent. She states that Makenzie lived with her for her entire life until December 2019, when the trial court ordered week on/week off custody. She claims that prior to then, she supported Makenzie and was the primary caretaker for her. She claims that Danny only visited Makenzie, "sometimes only once a week," and did not financially support her.

Tameka also takes issue with the trial court stating that she was not entirely honest with Danny about her initial temporary assignment in Kansas City, that she did not notify him about her intent to relocate Makenzie to the city, and that at times when she had custody, she was evasive about informing him of Makenzie's location. Tameka states that the admitted text conversations between her and Danny show that she informed him about

relocation and that the two had discussed it. Tameka states that she is willing to facilitate a relationship between Danny and Makenzie, which is shown by the fact that the she drove from Kansas City to Shreveport every weekend for more than a year and was always timely in taking Makenzie to see her father. She points out that Danny was not willing to meet halfway to exchange Makenzie. Tameka argues Danny was absent for days at a time from Makenzie's life prior to her move to Kansas City and missed her birthday party. She states that she has been more involved in Makenzie's life than Danny.

Tameka states that in Ms. O'Brien's first evaluation, she stated that because of Makenzie's young age, she relies more on her mother than her father and that it is in her best interest to reside with the same sex parent who can provide for her emotional, physical, and financial needs. Tameka states that she works from home four days a week and does not work Friday through Sunday, so she is able to take Makenzie to school and pick her up every day, and she has time for weekend activities with her. She said that Makenzie's half-sister lives with her, and she can provide more opportunities for Makenzie, because her job is secure and she earns a substantial income. Tameka states that evidence was presented that Danny plays too roughly with Makenzie, which he described as "joyful playing." However, Tameka states, Ms. Womack was concerned enough about it to report it to child protective services. Tameka asks this court to reverse the trial court's ruling and allow her to relocate Makenzie.

Danny argues that Tameka presented little evidence to the trial court addressing the factors found in La. C.C. art. 134 and La. R.S. 9:355.14.

Danny states that Tameka's allegations about him not being fully involved in Makenzie's life stem from two text messages in 2019 and 2020, focusing on a time period more than four years ago. Danny says that Tameka did not present evidence about the quality of schools or extracurricular activities found in Kansas City, proving how Makenzie would benefit from relocating there. Danny presented the court with evidence about the school Makenzie currently attends, her report card, the quality of medical care, what her home life and bedroom were like, and the other activities available to her in Shreveport. Danny states that he is also able to provide Makenzie with a strong religious background.

Danny claims that if Makenzie relocates, it will prove difficult for him to be able to participate in special events in her life, because he cannot travel to Kansas City on a regular basis. Tameka failed to present any physical evidence of her increase in salary with her promotion and of the financial, emotional, and/or educational benefits of attending school in Kansas City. Danny says that Tameka desires to relocate, because moving will benefit her and she wants Makenzie with her. Tameka wanted to relocate for employment opportunities and Danny opposed relocation because it would negatively impact his relationship with his daughter. Danny states that it appeared from the record that Tameka has not managed her finances properly, having a history of declaring bankruptcy and receiving delinquency notices and receipts for payday loans. Danny asks this court to affirm the trial court's ruling.

First, we note that the trial court was correct in analyzing this case under both La. C.C. art. 134 and La. R.S. 9:355.12 based upon the fact that

22

Tameka made an out-of-state move with the parties' child that was opposed by Danny during their divorce proceedings and before any custody issues were determined or settled. *See Atkins v. Atkins*, 47,563 (La. App. 2 Cir. 9/26/12), 106 So. 3d 614.

The paramount consideration in any child custody case is the best interest of the child. La. C.C. art. 131; *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731; *Langston v. Langston*, 54,611 (La. App. 2 Cir. 5/25/22), 340 So. 3d 1272. A parent seeking to relocate the principal residence of a minor child has the burden of proving that the proposed relocation is in good faith and that the proposed relocation is in the best interest of the child. La. R.S. 9:355.10; *Hernandez v. Jenkins*, 12-2756 (La. 6/21/13), 122 So. 3d 524; *Langston v. Langston, supra*; *Wylie v. Wylie*, 52,800 (La. App. 2 Cir. 5/22/19), 273 So. 3d 1256.

La. R.S. 9:355.14 provides that in reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the 12 factors enumerated therein. While La. R.S. 9:355.14 requires consideration of all 12 factors, the court is not required to give preferential consideration to any certain factor or factors. *Gathen v. Gathen*, 10-2312 (La. 5/10/11), 66 So. 3d 1; *Langston v. Langston, supra*. The district court has great discretion in child custody cases, and an award of child custody will be disturbed only on a showing of abuse of that discretion. *Id*.

This court will now consider the relevant factors from La. C.C. art. 134.

> 1. La. C.C. art. 134(A)(1): The potential for the child to be abused, as defined by Children's Code Article 603. The trial

court was correct that there was no evidence presented at trial that Makenzie was or would be abused by either party. While Tameka attempts to cast doubt on Danny with regard to this factor, the trial court did not find, and we agree, that Makenzie has been abused by either parent. This factor does not favor either party.

2. La. C.C. art. 134(A)(2): The love, affection, and other emotional ties between each party and the child. The trial court found that both parents show love and affection toward Makenzie and were capable of doing so in the future. This factor favors both parties.

3. La. C.C. art. 134(A)(3): The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. The trial court correctly found that both parents had the capacity and disposition to give Makenzie love, affection, and spiritual guidance, and to continue her education. Both provided evidence of the schools Makenzie would attend in their respective cities. Danny testified about his work as a pastor at his church and bringing Makenzie to his church, and Tameka testified that she had taken Makenzie to church previously. This factor favors both parties.

4. La. C.C. art. 134(A)(4): The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. The trial court determined that both parents provided food, clothing, and shelter to Makenzie, and both had done so since her birth. We agree that this factor favors both parents.

5. La. C.C. art. 134(A)(5): The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. The trial court stated that Makenzie lived in a stable adequate environment equally between both parents, because they shared equal custody of her. We find this to be true.

6. La. C.C. art. 134(A)(6): The permanence, as a family unit, of the existing or proposed custodial home or homes. The trial court determined that Danny was able to provide permanence, as a family unit, of the existing or proposed family home, because he has always lived in Shreveport. The court noted that Makenzie always lived in Shreveport, and Tameka had lived in Kansas City for a short period. We agree with the court's assessment.

7. La. C.C. art. 134(A)(7): The moral fitness of each party, insofar as it affects the welfare of the child. The trial court

24

observed and this court agrees that Tameka was not entirely honest with Danny about relocating to work in Kansas City and she did not notify him of her intent to relocate Makenzie permanently until she was situated there for several months. Danny tried to discover where Makenzie was during Tameka's custodial periods, and she was "extremely evasive" in responding to his requests for information. This court finds those facts troubling, showing Tameka's unwillingness to fully communicate with Danny, which could have adverse effects on Makenzie.

8. La. C. C. art. 134(A)(9): The mental and physical health of each party. There was no evidence presented indicating that either parent has mental or physical health issues. The trial court considered Ms. O'Brien's reports, which initially recommended 50/50 custody, but Tameka's intent to relocate Makenzie made that recommendation unworkable. We agree, as the distance between Shreveport and Kansas City makes a 50/50 custody arrangement impossible for a school-aged child. This factor favors Danny.

9. La. C.C. art. 134(A)(10): The home, school, and community history of the child. The trial court found this factor equal between Makenzie's parents, because they had been sharing 50/50 custody. We agree.

10. La. C.C. art. 134(A)(12): The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. The trial court expressed concerns regarding this factor. The court described Danny and Tameka's relationship as "very contentious" and that the two were "bitter toward one another and appear to harbor ill feelings toward the other." However, the court expressed optimism towards the pair reconciling their differences to raise their daughter. This court does not find the trial court's determination about this factor to be in error.

11. La. C.C. art. 134(A)(13): The trial court pointed out that the distance between Shreveport and Kansas City is substantial and would make exchanging Makenzie difficult. We agree.

12. La. C.C. art. 134(A)(14): The responsibility for the care and rearing of the child previously exercised by each party. The trial court found that both parents exercised their responsibility in caring for and rearing Makenzie because they shared the task between them for nearly three years. The trial court did not agree with Tameka's testimony that she cared for Makenzie 100% of the time prior to the week on/week off custody order from the court. We agree with the trial court.

We will next examine the relevant factors found in the relocation statute, La. R.S. 9:355.14.

1. La. R.S. 9:355.14(A)(1): The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life. The trial court found that Makenzie had a relationship with both parents, because they had shared equal custody since December 2019, so that factor was equal between the two parties. We also note that Danny and his mother testified about their family that resides in Shreveport. Likewise, Tameka stated that her adult daughter, Makenzie's sister, lives with her in Kansas City.

2. La. R.S. 9:355.14(A)(2): The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development. The court stated that Tameka provided the court with information about what school Makenzie would attend in Kansas City, but nothing about any activities available for a child in the city. Danny provided both about Shreveport. Danny provided photographs depicting Makenzie's room and testified about what her home life is like. Tameka provided little information about the same.

3. La. R.S. 9:355.14(A)(3): The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties. The trial court found that it was not practicable for Danny to travel regularly to Kansas City to see Makenzie, and that Makenzie not having daily contact with her father would not be in her best interest. Danny works as a pastor and his busiest time at work is on the weekends, making it difficult to travel to Kansas City. Tameka testified that she is off from work Friday through Sunday, when Makenzie is not at school, making it more practical for her to travel to Shreveport if she desires to see her daughter at times that she is not attending school.

4. La. R.S. 9:355.14(A)(5): Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party. The trial court determined that neither parent had or would attempt to thwart the relationship between Makenzie and the other parent. We do not agree with that finding. Tameka testified that she told Makenzie that her father would not allow her to talk to her except on certain days of the week. The trial court admonished

Tameka for telling her daughter that and said that it was the court that ordered the communication arrangement and not Danny. Tameka also did not fully communicate with Danny about Makenzie's whereabouts during their 50/50 custody arrangement, as discussed above. We find that Tameka has shown a willingness in the past to interfere with Danny's relationship with Makenzie.

5. La. R.S. 9:355.14(A)(6): How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity. The court found that Tameka neglected to present evidence, other than her "limited" testimony to show how it is in Makenzie's best interest to relocate with her to Kansas City. Danny, conversely, provided photographs, information about activities in Shreveport, and his testimony about what Makenzie's life would be like if she remained in Shreveport with him named as domiciliary parent.

6. La. R.S. 9:355.14(A)(7): The reasons of each person for seeking or opposing the relocation. Tameka relocated because of her employment, which the court found to be legitimate and sincere. The court said that Danny opposed relocation because Makenzie would not have daily contact with him. We agree with the trial court that both are valid reasons for the parties to want or oppose relocation.

7. La. R.S. 9:355.14 (A)(8): The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child. The court found this factor to be equal between the two parents. We agree.

8. La. R.S. 9:355.14(A)(9): The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation. The court noted that no child support had been ordered in this case, but that each parent supported Makenzie while she was in their custody. We also find this factor to be equal between the parties.

9. La. R.S. 9:355.14(A)(10): The feasibility of a relocation by the objecting person. The court stated that Danny cannot relocate, because he has employment and responsibilities in Shreveport. We agree and again state that Tameka testified about her work schedule which allows for more flexibility on the weekends for her to see her child when Makenzie is not in school.

The consideration on appeal regarding the ruling of the trial court in a relocation case is whether it abused its great discretion in arriving at that conclusion. It is clear here that both parties love and care for Makenzie. However, Tameka provided little information about how it is in Makenzie's best interest to relocate to Kansas City. Having examined the evidence presented and the trial court's ruling, we cannot say that the court abused its discretion in denying relocation, awarding joint custody, and naming Danny as the domiciliary parent. This assignment of error is without merit and the trial court's ruling should be affirmed.

## CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed. Costs of the appeal are assessed to appellant.

**AFFIRMED.**